UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY SHANE PRUITT

      Plaintiff,

  v.

GROSSE POINTE PUBLIC SCHOOL
SYSTEM, et al.

      Defendants.

Case No. 26-cv-10958

Honorable Robert J. White

**ORDER GRANTING PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

Plaintiff Gary Shane Pruitt, a parent, attempted to raise concerns with officials from the Grosse Point Public School System (the District) about the educational environment at the public middle school his child attends. Pruitt objected to the display of rainbow pride flags in classrooms. The District officials could have listened to Pruitt's concerns and then defended a teacher's decision to display the flag. Surely, the teacher only aimed to create a welcoming environment for all her students. Instead, Pruitt's concerns were dismissed.

So Pruitt visited the school to record a video of the flag. He came with his son, after school hours, and only entered the school after receiving permission from a school employee. And despite the fact multiple school officials observed him in

1

the school, he was never asked to leave. Weeks passed without comment or action from school officials.

Then Pruitt took his concern to a public forum—posting a video to social media showing the rainbow pride flag on display. The video included Pruitt's voiceover calling the display of the rainbow flag political and divisive, and he called on parents to "speak out" about the "radical programing" from "groomer teachers[.]" In response, the school principal initially sent an e-mail to parents, affirming the non-threatening nature of the video and identifying its publication as the "political" speech of a "parent[.]"

But public criticism followed. The District, citing complaints from staff and community members for the "disruption to the educational environment[,]" issued Pruitt a no-trespass order. A picture of Pruitt's face was posted at the entry to the school and the district threatened criminal prosecution if Pruitt violated the order. Moreover, the District informed Pruitt in writing that his total ban on attendance at extracurricular activities could only be revisited "at the sole discretion" of the District. Eighteen months passed without so much as a violation from Pruitt, but his requests to lift the order were denied. Finding no resolution, he sued.

At bottom, Pruitt's video criticizing public-school officials constitutes speech protected by the First Amendment to the United States Constitution. The way public schools educate children is a core matter of public concern and debate. The District

2

retaliated against Pruitt for his speech with their after-the-fact imposition of a no-trespass order and threat of criminal prosecution. The timing of the District's written correspondence in this case, as well as the content of the order itself, confirms as much.

As a result, Pruitt is likely to succeed on the merits. His loss of First Amendment freedoms constitutes irreparable injury. The balance of equities is squarely in Pruitt's favor, and the public interest is best promoted where, here, First Amendment speech is protected. Pruitt moved for a preliminary injunction. (ECF No. 5). Defendants responded. The Court held a hearing. For the following reasons, the Court grants Pruitt's motion.

## I.    Background

Parcells is a public middle school that serves students from fifth through eighth grade. Pruitt's son will be entering the seventh grade at the school. Pruitt attended an event with his son in September 2024 and "observed many rainbow/transgender pride flags on display at the school." (ECF No. 1, PageID.4-5).

Concerned about "the forced acceptance of homosexual symbols (rainbow flags) in the Grosse Pointe School classrooms," Pruitt spoke with both Jason Wesley, the school's principal, and Roy Bishop, Jr., the District's deputy superintendent. Disappointed by these officials' stated inability to remedy his concerns, Pruitt

emailed the school board on September 16, 2024, "[to] see if there were any options that might be considered[.]"

The next day, board member Valarie St. John answered Pruitt's email as follows:

> Thank you for taking the time to write to the board. I can assure you that none of our teachers have been forced to hang rainbow flags in their classrooms. If any teacher is indoctrinating children into any sexual orientation, please report that to the principal, as that would be inappropriate. However, if you are simply concerned that your child is seeing the colors of the rainbow, I would suggest sending them with tinted sunglasses so they aren't subjected to the full spectrum.
>
> Michigan law requires that we protect our LGBTQ+ students, so Mr. Wesley and Dr. Bishop were correct that nothing is likely to change. The board cannot overrule state law.

(ECF No. 11, PageID.294).

At issue here is the video Pruitt posted to social media on October 14, 2024. (ECF No. 1, PageID.6-7; *see also* ECF 11, PageID.279). The video lasts roughly four minutes, with Pruitt providing a voiceover commentary throughout. The video depicts one classroom, recorded from near the room's open door, where a rainbow flag was prominently displayed. At various times in the video, a teacher is seen sitting at a desk beneath the flag, but the posted video redacted her face, as documented below:

 

(*See* ECF No. 11, PageID.279).

Concerning Pruitt's added commentary, he begins by saying, "This is more of an informative video to let all the parents know exactly what's going on in the school district, and of course everybody can form their own opinions after."  With the flag shown, Pruitt then says, "It's loud, it's in your face, but of course, they want to be loud about it.  So, what we're gonna [sic] do is give them the attention that they want."  Next, Pruitt expresses the view that the classroom display of rainbow flags is (1) political, (2) divisive, (3) controversial, (4) non-inclusive and intimidating to students who don't agree with the flags' message, and (5) represents a display of sexuality inappropriate for children that "shouldn't be pushed onto any student by these teachers."  Pruitt then accuses the school board of "turning a blind eye" to "adults who are consciously deciding to push a display of sexuality onto children." (*See* ECF No. 11, PageID.279).

He concludes the commentary as follows: "Do you want to continue to let these groomer teachers push their distorted worldview upon your children and the values that you raised them with [sic]? Or would you like to stand with us in speaking out against it?" (*See* ECF No. 11, PageID.279).

Pruitt testified that he took the video footage during an after-hours visit to Parcells on September 30, 2024, two weeks before he posted it; he "obtained permission from school personnel in the office . . . to enter the school building" and "simply videotaped the flags that were on display at the school in various classrooms and hallways."  Pruitt also asserts that he "provided a voiceover commentary to the video with his constitutionally protected speech and political opinion regarding the video." (ECF No. 1, PageID.7).

One day after Pruitt posted the video, Wesley, Parcells' principal, contacted the school's parents at large "to bring to your attention that a video has recently been circulating on Facebook, and we are aware of the concerns it may raise within our community."  Wesley said the video was "political in nature, as expressed by a parent," and "did not contain any threatening content[.]"  But Wesley recognized that the video "may prompt questions or concerns about our school environment," stating the safety and well-being of students is the school's top priority.  Welsey also informed parents there would be an increased police presence at the start of each school day "to ensure a safe, supportive, and positive environment for all our

students and families."  Wesley said the school was "committed to addressing any issues that arise from this incident," and he assured parents "that we are actively investigating the situation in collaboration with our central office and district officer to determine the appropriate steps to take." (ECF No. 11, PageID.294).

Pruitt responded to the school officials by email that same day, describing the video as a "peaceful protest" and saying parents have every right to voice their opinions when dismissed by school officials.  He said the video does not threaten physical violence or harm whatsoever, complained of St. John's "dismissive" and "sarcastic" response to his initial concerns, and told school officials to expect continued opposition from him and other parents. (ECF No. 11, PageID.295).

Next, on October 21, 2024, one week after Pruitt posted the video, counsel for the District issued Pruitt a no-trespass order restricting his entry onto school property. (ECF No. 11, PageID.290-92).  The order states:

> On behalf of the District, and at the direction of the Superintendent pursuant to Board Policy 8.07 – School Visitors, this correspondence constitutes a "no trespass" order to you based upon the facts and considerations outlined further below.
>
> On or about September 30, 2024, you entered a Grosse Pointe Public Schools (the "District") building at Parcells Middle School.  While at the school, you filmed the inside of a classroom and a staff member sitting at her desk and posted the resulting video to the "Grosse Pointe Public Schools Concerned Parents" Facebook page.  In the video, you maintain a voiceover narrative where you ask: "[d]o you want to continue to let these groomer teachers push their distorted world view upon your children?"  You also walked by and into the same teacher's classroom on at least two more occasions while you were in the

building.  Your actions intimidated the teacher, who was uncomfortable with your actions.  Additionally, you walked the entire building and recorded a second teachers' classroom in the basement.

Under the District's Board Policies and Administrative Guidelines, visitors shall schedule a visit with the teacher and the building principal before entering the classroom, as unscheduled visits are not advised. Administrative Guideline 8.07 – School Visitors.  Additionally, District policy states that school visitors shall refrain from evaluating personnel. In your Facebook post, you evaluate the teacher's classroom organization and management methods.  Pursuant to Board Policy, if a visitor's presence is detrimental to the educational process of the classroom, the Superintendent or building principal has the authority to prohibit or remove them from the school building. Board Policy 8.07 – School Visitors.   Additionally, the accusations that the District's teachers are "groomer[s]" may be considered defamatory and a harassment of staff.

The District has received complaints from District staff and community members related to the publication of your video on Facebook, particularly the "groomer" reference.  The complaints allege that your conduct is intimidating, harassing and defamatory.  It has caused a substantial disruption to the educational environment in our District. Therefore, pursuant to Board Policy and Administrative Guideline 8.07, you are being issued this no trespass order.

*          *          *

The District takes the gravity of your conduct and statements seriously, and to ensure the continued safety of students and staff, you are hereby notified **that you are prohibited under the Michigan Penal Code, MCL 750.552, from entering the lands and premises of District property, including all District classrooms**, other than to pick up or drop off your child from school while remaining in your vehicle – without prior approval from the District.  The District staff has been notified to contact the police immediately if you are observed violating this restriction.  This prohibition applies at all times and to all District property and extends to all locations where District events are taking place.

8

> Please be advised that if you violate this no trespass order, the appropriate authorities will be contacted, and you may be charged with criminal trespass under MCL 750.552.

> The District will consider revisiting this no trespass order with you at a later date for purposes of attendance at sporting events or extracurricular activities, at its sole discretion.

(ECF No. 11, PageID.290-92 (emphasis in original)). School officials also posted Pruitt's picture in Parcells' main office, identifying him as not being permitted on school property. (ECF No. 1, PageID.9).

As relevant here, the District's visitation policy referenced above "encourages visits to school by parents, other adult community residents, or other educators, so long as those visits do not disrupt or otherwise interfere with the educational process." (ECF No. 11, PageID.289).

> Any such visit shall be arranged in advance with the building administration. The Superintendent and the building principal or designee have the authority to prohibit entry to a school building of any person, or to expel any person, if there is reason to believe that such person's presence would be detrimental to the educational process or the good order of the school.

*Id.* Additional relevant guidelines provide that:

> A. Visits shall normally be scheduled with the teacher and the building principal to the extent possible. Unscheduled visits are discouraged.

> B. Such visits are for the purpose of becoming acquainted with school instruction, programs, personnel, operation, and/or the facility.

> C. Visitors shall refrain from giving directions or making evaluations of personnel or operating procedures during their visits.

9

D. If a school visit leaves a visitor with a concern, this concern should be discussed first with the building principal, and then the Deputy Superintendent or Superintendent.

(ECF No. 5-1, PageID.135-36).

The no-trespass order remains in effect, and Pruitt has never violated its restrictions. And with the order in place, Pruitt sought prior approval to access school property numerous times—to attend band or choir concerts, for example—and deputy superintendent Bishop never denied any of Pruitt's requests. However, Pruitt testified that he was unable to attend certain functions when he did not receive a response in time.

As clarified by witness testimony at the motion hearing, Pruitt complied with the order without objection throughout the 2024-25 school year to see whether compliance over time and an avoidance of further conflict with school officials would persuade them to rescind the order.[1] Accordingly, Pruitt sought to have the order lifted in advance of 2025-26 school year, but the District superintendent, Andrea Tuttle, denied his request. Tuttle testified that the denial was because Pruitt had not sufficiently redeemed himself as to be granted access like other parents.

---

[1] Despite adhering to the no-trespass order, Pruitt has continued to zealously and publicly express on Facebook his views regarding the display of rainbow flags, teacher indoctrination, parental rights, and similar issues, as well as criticism of the District and school board on these issues. (*See* ECF No. 11, PageID.300-76).

After securing counsel, Pruitt's attorney reached out to the District's counsel on January 16, 2026, to seek rescission of the no-trespass order and removal of Pruitt's picture from the school office without the need for litigation. (ECF No. 1, PageID.10; ECF No. 1-1, PageID.37-38).  This being unsuccessful, Pruitt filed suit on March 23, 2026. (ECF No. 1).  Pruitt now moves to enjoin Defendants from enforcing the no-trespass order, displaying his picture and related information on school property, and taking any additional retaliatory action in response to Pruitt's protected speech. (ECF No. 5, PageID.79, 89).  Further facts relevant to resolution of this motion are included in the analysis that follows.

## II.    Legal Standard

A district court has discretion to grant or deny preliminary injunctions. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).  Courts must consider four factors when evaluating a motion for a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits,
> (2) whether the movant would suffer irreparable injury absent a stay,
> (3) whether granting the stay would cause substantial harm to others,
> and (4) whether the public interest would be served by granting the stay.

*Oh. Republican Party v. Brunner*, 543 F.3d 357, 361 (2008) (quoting *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  The four factors are not prerequisites that must be met but are interrelated concerns that must be balanced together. *Ne. Ohio Coal. for Homeless*

11

*& Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

Preliminary injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). District courts must "view and weigh the evidence" in the preliminary record bearing on each factor. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014). And because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,]. . . a preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than in a trial on the merits." *Univ. of Tx. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); *see also Fetch! Pet Care, Inc. v. Atomic Pawz, Inc.*, 170 F.4th 546, 554 (6th Cir. 2026) (citations omitted).

### III.  Analysis

#### A. Likelihood of Success on the Merits

"A party is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). "However, in order to establish success on the merits of a claim, a Plaintiff must show more than a mere possibility of success." *Id.* "It is

ordinarily sufficient if the Plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

To sustain a claim for First Amendment retaliation,[2] "a plaintiff must show that (1) the plaintiff was participating in a constitutionally protected activity; (2) the defendant's action injured the plaintiff in a way likely to deter a person of ordinary firmness from further participation in that activity; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371 (6th Cir. 2011). "Once a plaintiff raises an inference that the defendant's conduct was motivated in part by the plaintiff's protected activity, the burden shifts to the defendant to 'demonstrate that it would have taken the same action in the absence of the protected activity.'" *Id.* (citation omitted).

### 1. Pruitt Was Participating in Protected Activity

As an initial matter, Defendants do not contest that Pruitt's speech satisfies the first element of retaliation, and the Court concludes he likely engaged in protected speech. Specifically, even if Pruitt's rhetoric was charged and offensive, he has the constitutional right to criticize public officials and institutions in this manner. *See*

---

[2] Pruitt's motion addresses only this single claim, but he "need only 'show a likelihood of success on the merits of at least one of [his] claims.'" *Union Home Mortg. Corp. v. Ballew*, 814 F. Supp. 3d 884, 905 (N.D. Oh. 2025) (citation omitted).

*Boddy v. Grech*, 178 F.4th 264, ___; 2026 U.S. App. LEXIS 16832 at *11-15 (6th Cir. 2026) ("The government may not censor speech merely because it is offensive to some[,]" and "[f]reedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values."); *Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018) ("as a nation, we have chosen to protect unrefined, disagreeable, and even hurtful speech to ensure that we do not stifle public debate"); *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 243 (6th Cir. 2015); ("expressive behavior that is deemed distasteful and highly offensive to the vast majority of people . . . most often needs protection under the First Amendment").

Furthermore, nothing in Pruitt's video implicates any serious threat of or encouragement to violence or any unlawful activity. *See Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 736 (6th Cir. 2020) ("Speech that does not specifically advocate for listeners to take unlawful action does not constitute incitement.") (cleaned up); *Hess v. Oakland Cnty.*, 174 F.4th 981, 993 (2026) ("A true threat is a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.") (cleaned up).

To the extent Defendants assert that certain staff felt threatened and/or intimidated by Pruitt's conduct, the Court concludes it unlikely that the video rises to the level of a true threat. The video never mentions violence or harm whatsoever, it was posted publicly online rather than targeted at any specific individual or group,

14

it concerned a divisive political issue, and there is no evidence Pruitt had a history making prior threatening statements. *See Hess*, 174 F.4th at 993 (Protected speech "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials[,]" and "the First Amendment permits a wide range of political hyperbole[.]") (citations and quotation marks omitted).

Further, despite Defendants' stated concerns with the tone of Pruitt's commentary, he largely spoke in a calm and measured voice, even if the views expressed were hurtful or distasteful, and explicitly stated that the video was meant to be informational. And his call to action merely encouraged other agreeable parents to speak out. Indeed, the school principal's message to parents following the video explicitly states: "The video did not contain any threatening content; rather it was political in nature, as expressed by a parent." (ECF No. 11, PageID.294).

Lastly, concerning Pruitt's conduct in filming the relevant classroom and teacher on September 30, 2024, the teacher testified that Pruitt did not threaten her in any way. In fact, there is nothing in the record to indicate that Pruitt ever said anything to the teacher that day. In sum, the Court concludes at this preliminary stage that Pruitt engaged in protected speech as necessary to satisfy the first prong of his retaliation claim.

## 2. Defendants Injured Pruitt in a Way Likely to Deter the Protected Activity

15

Defendants argue that "there is absolutely no evidence to suggest that a person of ordinary firmness would refrain from continuing to speak on the topic of alleged teacher indoctrination of students on sexual preference" based only on the District's no-trespass order at issue here. According to Defendants, "Plaintiff cannot make such an argument here because there is no evidence that he sought to enter school grounds and was denied." Defendants also reference Pruitt's continued posting to Facebook as evidence that he was never deterred from speaking out in this case. (ECF No. 7, PageID.162-63).

However, "'the issue is whether a person of ordinary firmness would be deterred, not whether [the plaintiff] himself actually was deterred' by the adverse action." *Heyward v. Cooper*, 88 F.4th 648, 657 (6th Cir. 2023) (citation omitted; alteration in original); *see also Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) ("*Actual* deterrence need not be shown.") (emphasis in original); *Reguli v. Russ*, 109 F.4th 874, 881 (6th Cir. 2024) ("the First Amendment protects the stout no less than the timid"). It is therefore irrelevant whether Pruitt continued his advocacy.

The Court concludes that Pruitt has met his burden under this second prong. Even if no one ever denied Pruitt's requests for access under the no-trespass order, he is restricted in ways inapplicable to other parents by the requirement to seek prior approval itself. More importantly, Pruitt was threatened with criminal prosecution, and Defendants displayed his picture in the school office for all to see. The Court

16

finds that such action would more than likely deter a person of ordinary firmness from speaking further, particularly for a parent actively engaged in their child's schooling and extracurriculars. *See Heyward*, 88 F.4th at 657 ("The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury."); *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) ("Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact.").

### 3.  The District's Actions were Motivated by Pruitt's Speech

Pruitt argues that Defendants' actions can be at least partially attributed to the protected content of his speech given the timeline of events at issue, Defendants' own words, and that the no-trespass order explicitly and extensively discusses the video and its expressive content.  He also argues that Defendants' alleged safety rationale is belied by the record and, even if believed, was in addition to Defendants' partial and improper retaliatory motive. (ECF No. 5, PageID.101-04).

According to Defendants, they issued the no-trespass order not based on the political content of Pruitt's video, but because "the tone of the message, the words used and the promise to continue raised red flags about the potential for harm to students—a risk that no school administrator today is willing to take." (ECF No. 7, PageID.164).  And Defendants assert that Pruitt's speech, together with his conduct

17

in entering the school and recording the footage, his efforts to hype the message on social media, and the current safety concerns facing all schools, caused intimidation and fear warranting the no-trespass order regardless of Pruitt's viewpoint.

As an initial matter, much of Defendants' witness testimony and attorney argument at the hearing focused on the disruptive nature of Pruitt's conduct in entering the school, walking around unsupervised, and filming the teacher's classroom without permission. (*See also* ECF No. 14, PageID.396 (Defendants issued the no-trespass order "due to concerns about Plaintiff's actions disrupting the educational environment.")).   Relatedly, the no-trespass order itself states that Pruitt's conduct "has caused a substantial disruption to the educational environment" and references school officials' power to restrict "even the most fundamental rights" pursuant to *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). (ECF No. 11, PageID.290-91).

However, in a similar case with a parent who criticized a school official and claimed retaliation after he was banned from attending his daughter's softball games, *McElhaney v. Williams*, 81 F.4th 550, 553 (6th Cir. 2023), the Sixth Circuit held that *Tinker* and related student speech cases applying the substantial disruption test do not apply "to run-of-the-mill adult speech targeting school officials," *id.* at 558-59. "That is not to say that school officials are entirely hamstrung in dealing with a parent like McElhaney.  For example, . . . a school may impose reasonable, viewpoint

neutral, time, place, and manner restrictions on parental interactions with the school. . . . But retaliating against speech on the basis of its content, as alleged here, drifts into foul territory." *Id.* at 559.

Deciding only whether the case involved a clearly established right to defeat the invocation of qualified immunity with respect to a motion for summary judgment, the *McElhaney* Court rejected the defendants' reliance on student-speaker precedents. *Id.* at 556-59. The Court first determined that any reasonable official would have understood the plaintiff's criticism to be protected, and it ultimately concluded that when a parent criticizes "the ways in which school employees treat the parent's child at school, . . . it is clearly established at a low level of generality that a school official may not retaliate against the parent for the content of his speech." *Id.* at 557-59.[3] The Court then remanded the case back to the district court to determine in the first instance whether a constitutional violation occurred, including—specific to the third prong of retaliation—whether "defendants' actions

---

[3] Defendants argue in part that qualified immunity bars Pruitt's federal claims because he cannot establish that any constitutional violation, even if one occurred, affected a clearly established right. But because this case, like *McElhaney*, involves school officials allegedly retaliating against a parent at least in part for the protected content of his speech, Pruitt has likewise satisfied the clearly established prong with respect to qualified immunity. And even if Defendants are entitled to qualified immunity, this does not bar the relief Pruitt seeks with his motion for a preliminary injunction. *See McCrea v. Zieba*, 955 F. Supp. 801, 807 (N.D. Oh. 1996) ("[T]he defense of qualified immunity protects officials only from suit for monetary damages[,] . . . [and a]n individual is not entitled to immunity from actions seeking only injunctive and declaratory relief.").

were motivated by McElhaney's speech, rather than the time, place, or manner of that speech." *Id.* at 559-60.

Defendants cite to two student-speaker cases for the general propositions that Courts reviewing the decisions of school officials should (1) defer to the officials' exercise of their professional judgment and (2) consider recent events' implications on school safety. However, these cases—as well as the substantial disruption standard applicable to student speech—are largely inapplicable here. Following *McElhaney* and the requirements for a parent to establish First Amendment retaliation, *see also Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-89 (6th Cir. 2008), the Court will still consider Defendant's stated concerns regarding safety. But only to determine whether the adverse actions were truly justified with no consideration of Plaintiff's viewpoint.

Having considered the parties' respective evidence, the Court concludes that (1) Pruitt has established that Defendants acted at least in part due to his protected speech and (2) Defendants have not demonstrated they would have taken the same action had Pruitt not spoken out. *See Napolitano*, 648 F.3d at 371 ("Once a plaintiff raises an inference that the defendant's conduct was motivated in part by the plaintiff's protected activity, the burden shifts to the defendant to 'demonstrate that it would have taken the same action in the absence of the protected activity.'") (citation omitted)).

20

First, as evidentiary support for their viewpoint neutrality, Defendants cite the email to Pruitt from school board member St. John.  This, however, is unavailing.  St. John's message starts innocent enough by addressing the issue of teacher indoctrination and explicitly stating that it would be inappropriate and should be reported if a teacher was indoctrinating children into any sexual orientation.  But St. John addressed Pruitt's chief concern regarding the mere display of rainbow flags with apparent sarcasm and contempt.  This certainly evinces at least some hostility to Pruitt's views among the school officials involved in this case.

To the extent Defendants raise concerns with the tone rather than the viewpoint of Pruitt's speech, this is similarly unavailing.  As stated, Pruitt largely spoke in a calm and measured voice, he explicitly stated that the video was meant to be informational, and his call to action merely encouraged other agreeable parents to speak out.  And this objective reality provides further support that Defendants acted at least in part due to Pruitt's protected viewpoint rather than the manner in which he spoke. *See Boddy v. Grech*, 178 F.4th 264, 274 (6th Cir. 2026) ("Here, the record shows that Grech's application of the rules to Boddy's speech was not content neutral. . . . First, consider the idea that Grech cut off Boddy because of her hostile tone.  As the district court found—and the video evidence confirms—Boddy's tone and demeanor were objectively professional and consistent with proper decorum.  So this first rationale is no help to defendants.").

Next, according to Defendant's pre-hearing materials, they "received multiple complaints that allowing an unsupervised adult to roam the building presented safety concerns for staff and students." And they issued the no-trespass order "due to concerns about Plaintiff's actions disrupting the educational environment." (ECF No. 14, PageID.396). Consistent with these proposed factual findings, Defendant's witnesses consistently testified that it would cause serious safety concerns for a parent to wander around unsupervised, particularly in areas of the school they were not meant to be. Furthermore, Bishop and Tuttle both testified that they received complaints from school staff and the teacher's union that teachers were fearful because of Pruitt walking the building unsupervised. And according to Tuttle, her decision to issue the no-trespass order had *nothing* to do with the content of Pruitt's speech.

But the record of this case, particularly the record contemporaneous with the actual events at issue, shows otherwise. Concerning Pruitt's entry into the school, it is undisputed that he was allowed in with permission from an office official after a brief waiting period, which complies with the requirement for visits to be arranged in advance with the building administration. Certainly there is conflicting testimony on whether Pruitt told office staff he wanted to tour the school or merely visit his son's classrooms, but nothing in the record shows that Pruitt violated any school policy during the visit. Specifically, there was no policy in place at the time

preventing parents from walking the building unsupervised, lest Pruitt would not have been able to do just that after being let through.  And to the extent school policy prohibits the evaluation of school personnel, this restriction explicitly applies "during . . . visits." (ECF No. 5-1, PageID.136).  It is undisputed that Pruitt did not evaluate anyone during his visit and only added his video commentary after the fact.  Lastly, while defense counsel referenced the District's internet policy at the hearing, nothing therein—nor in any other policy—prevents anyone from recording inside school buildings.

The school's office worker who buzzed Pruitt in testified that she received no complaints that day about Pruitt's conduct, and that she heard concerns only after Pruitt posted the video to social media.  Further, Pruitt testified that Wesley, the principal, walked past him during the visit and made no comment about him being unsupervised.  Wesley merely testified that he did not recall seeing Pruitt.  Relatedly, the teacher who Pruitt filmed testified that she sent Wesley an email that evening and spoke with him the next day about Pruitt's conduct in filming her classroom and her resulting concern for school safety.  And the record shows that the school has surveillance cameras in its hallways, so any concerning action by Pruitt should have been apparent at the time, if not investigated immediately following the teacher's report to Wesley.

However, Pruitt testified that he was never contacted about having violated any school policy during his visit until after he posted the video to Facebook. Indeed, it was two weeks later, after Pruitt posted the video, before Defendants took any action in response to his allegedly disruptive behavior. Even then, Wesley said "[t]he video did not contain any threatening content" and "was political in nature, as expressed by a parent." (ECF No. 11, PageID.249). And the no-trespass order itself explicitly discussed the content of Pruitt's video and his views expressed therein, particularly his reference to teachers as "groomer[s]." Most importantly, the order cited complaints from staff and community members "related to the publication of [the] video on Facebook, *particularly the 'groomer' reference*." (ECF No. 11, PageID.290 (emphasis added)).

The record thus supports that the adverse actions taken by the District against Pruitt were based at least in part on the specific words he used—i.e., the content of his speech—and the complaints that followed, even if staff harbored additional legitimate safety concerns based on his conduct. And the fact that nothing happened for weeks after Pruitt's visit, and only following the publication of his video, provides additional support that Defendants were influenced to act based on Pruitt's protected speech rather than—or at least in addition to—his conduct during the earlier visit and any related safety concerns.

24

Further, to the extent the record shows that Defendants acted in part due to the offense or other reaction caused by Pruitt's specific words, it is unconstitutional to punish a speaker because others are hostile to the viewpoint expressed. *See Boddy v. Grech*, 178 F.4th 264, 273 (6th Cir. 2026) ("The government may not censor speech merely because it is offensive to some. . . . A contrary rule would permit a majority to silence dissidents and allow the government to ban the expression of unpopular views.") (cleaned up); *id.* at 275 ("The First Amendment does not permit a heckler's veto.  Rooted in the idea that the government cannot favor one citizen's speech over another, we have held that speech does not lose its protection under the First Amendment due to the lawless reaction of those who hear it.  And punishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose.").

Lastly, Wesley, while expressing safety concerns arising from Pruitt's conduct during his visit, affirmed that officials' safety concerns *also* related to the *content* of Pruitt's speech.  Although Wesley was not involved in actually issuing the no-trespass order, this testimony further supports that the school officials in this case considered Pruitt's viewpoint in formulating their course of action.

Given the foregoing, the Court finds it sufficiently likely that Defendants retaliated against Pruitt at least in part because of his publicly expressed political

views.  Stated differently, Pruitt "has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation" and established "more than a mere possibility of success" on this element of his First Amendment retaliation claim. *See Tenke Corp.*, 511 F.3d at 543.

## B. Irreparable Injury

"[A] movant [must] show that 'irreparable injury is *likely* in the absence of an injunction,'" *Fetch! Pet Care, Inc. v. Atomic Pawz, Inc.*, 170 F.4th 546, 558 (6th Cir. 2026) (citations omitted; emphasis in original), and the movant suffers irreparable harm if the injury "is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578.  An injury is not fully compensable by monetary damages "if the nature of the [moving party's] loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  The injury "must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up).  Irreparable harm "is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id*. (emphasis in original).

> Of course, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.  A plaintiff, however, must also show that the alleged harm is likely, not remediable at final judgment, and immediate.  Even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement.  After all, if the plaintiff isn't facing imminent and

26

irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit.

*Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 513 (6th Cir. 2025) (cleaned up; emphasis in original).

Defendants argue that Pruitt cannot establish irreparable injury here because (1) of his delay and lack of diligence in seeking preliminary injunctive relief a year and a half after Defendants issued the no-trespass order and (2) "there is no evidence . . . that the Pruitt violated or attempted to violate the parameters of the No-Trespass Order at any time within the last year and a half[,] . . . [and] no evidence that he sought District approval for any activity and was denied." (ECF No. 7, PageID.153-60).

Concerning this latter argument, Defendants assert that the above-quoted facts prevent finding that Pruitt's "claimed harm is 'likely, not remedial at final judgment, and immediate,'" as required by *Moms for Liberty* even in First Amendment cases. (ECF No. 7, PageID.158-60).   The facts of *Moms for Liberty*, however, are distinguishable from the present case.

As relevant here, the Sixth Circuit in *Moms for Liberty* stated:

[B]etween the [School] Board's removal of the rules, the fact they have not been reinstated in over two years, and the commitments by Defendants' counsel that his client will not reinstate them, Plaintiffs cannot show a "likely" threat of irreparable harm before a final decision on the merits.  That ends their quest for a preliminary injunction.

*Moms for Liberty*, 155 F.4th at 514.

In contrast to the allegedly unconstitutional rules that were unlikely to be reinstituted in *Moms for Liberty*, the no-trespass order here remains in effect, with the associated injury essentially continuing and, therefore, sufficiently likely and immediate. And as discussed, even if no one ever denied Pruitt's requests for access under the no-trespass order, he is restricted in ways inapplicable to other parents by the requirement to seek prior approval itself. Pruitt also remains subject to the threat of criminal prosecution, and his picture and the associated information remains displayed in the school office for all to see. Further, because these continuing adverse actions were motivated in part by Pruitt's protected speech, they certainly constitute an irreparable injury not remedial at final judgment (i.e., not fully compensable by monetary damages). *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated"); *see also KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 676 F. Supp. 2d 649, 654 (N.D. Oh. 2009) ("Reputational harm may rise to the level of irreparable injury.").

Next, concerning Pruitt's year-and-a-half delay in seeking preliminary injunctive relief after issuance of the no-trespass order, Defendants primarily rely on *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889 (8th Cir. 2024). As particularly relevant here, *Hotchkiss* provides:

We agree with the district court that Hotchkiss failed to make a clear showing 'that irreparable injury is likely in the absence of an injunction.' This lawsuit was filed sixteen months after Hotchkiss was served with the no-trespass notice. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*[ *v. Lamone*, 585 U.S 155, 159 (2018)]; *see Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (unreasonable delay "is a sufficient basis to deny" a preliminary injunction). Hotchkiss had moved his child to another school district, missed thirty-eight Board meetings, and failed to express his views in writing, as the notice permitted. On June 8, 2023, three weeks before the preliminary injunction hearing, Hotchkiss filed a Declaration that "I would like to attend meetings of the Cedar Rapids Community School District school board. I will comply with the district's reasonable rules for decorum at those meetings." We agree with the district court that this last-minute Declaration is unsupported and speculative. "Speculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (citation omitted).

For these reasons, we conclude the district court did not abuse its discretion when it denied Hotchkiss's motion for a preliminary injunction because he failed to make an adequate showing of irreparable harm.

*Id.* at 894 (first alteration in original).

Although this case similarly involved a parent claiming first amendment retaliation against school officials after he was banned from district property, it is inapplicable here for several reasons. First, the case is distinguishable because the plaintiff had moved his child to a different district by the time he moved for preliminary injunctive relief. Given this critical fact, certainly it was speculative that the plaintiff would ever return to the district's property. Here, however, Pruitt's son remains enrolled in the District and will start seventh grade this Fall. And Pruitt

29

remains subject to restrictions on his involvement in his son's education that are inapplicable to other parents.

*Hotchkiss* is also not binding in this district. And with respect to reasonable diligence, Sixth Circuit authority provides that "[a]n unreasonable delay in filing for injunctive relief will *weigh against* a finding of irreparable harm." *Kerwin v. Trinity Health Grand Haven Hosp.*, 174 F.4th 942, 958 (6th Cir. 2026) (emphasis added). Accordingly, even considering the delay in this case as weighing against a finding of irreparable injury, this weight is insufficient to preclude such a finding here.

In any event, the Court concludes that Pruitt's delay was not unreasonable under the circumstances. Pruitt credibly testified that he initially sought to abide by the no-trespass order without objection to see whether compliance over time and an avoidance of further conflict with school officials would persuade them to rescind the order. This was particularly reasonable considering that Pruitt, with permission from school officials, attended various school functions during this time. Especially given Defendants' stated concerns, it makes sense that Pruitt would comply for a time to prove he was not a disruption or threat when permitted on school property, even as he continued to speak out on social media.

Consistent with such efforts, Pruitt first sought rescission of the no-trespass order in advance of the 2025-26 school year but was denied. From this point forward, time must be allotted for Pruitt's efforts to secure counsel, for investigation

30

of his claims, and to accommodate the initial efforts of Pruitt's attorney in January 2026 to mutually resolve the dispute without litigation.  Indeed, because much of the delay here can be attributed to Pruitt's good-faith efforts to resolve the matter without filing suit, he did not *unreasonably* delay moving for preliminary injunctive relief.  Accordingly, the delay here does not undercut Pruitt's showing of irreparable injury.

## C. Remaining Factors

According to Pruitt, Defendants would suffer no harm if an injunction is issued, and the public interest heavily favors protecting his First Amendment rights. (ECF No. 5, PageID.119-21).  The Court agrees.

First, during the almost two years Pruitt has been restricted by the no-trespass order, with him continuing to speak out on social media, he has still been allowed on school property for certain functions.  Critically, there is no evidence Pruitt's presence was threatening, intimidating, or otherwise disruptive at any of these times when school officials gave him permission to access the property.  This certainly counters the claim that Pruitt's continued access could result in any substantial harm to anyone.  Even without the no-trespass order, Pruitt remains subject to the policies applicable to all parents.  For example, he still cannot visit the school building without checking in and getting administrative approval.

Because (1) Pruitt's presence has caused no issues in almost two years since Defendants issued the no-trespass order and (2) Defendants remain empowered to

impose viewpoint-neutral restrictions on Pruitt's interactions with the school, the Court concludes that there would be no substantial harm, to Defendants or others, if they are enjoined from enforcing the order.  Lastly, the final factor favors issuance of an injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Dahl v. Bd. of Trs. of Western Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021).

* * *

For the reasons given, the Court ORDERS that Pruitt's motion (ECF No. 5) is GRANTED.

IT IS FURTHER ORDERED that Defendants are enjoined from enforcing the no-trespass order, displaying Pruitt's picture and the related information on school property, or taking any additional retaliatory action in response to Pruitt's protected speech.

Dated: July 24, 2026                    s/Robert J. White
                                         Robert J. White
                                         United States District Judge

32